## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DANNY D. HOSKINS,                    *

    Plaintiff                    *

        v                    *          Civil Action No. DKC-17-3823

WEXFORD HEALTH SOURCES, INC.,        *
BEVERLY McLAUGHLIN,
WARDEN RICHARD J. GRAHAM, JR.        *

    Defendants                    *
                                   ***

### MEMORANDUM OPINION

Plaintiff Danny Hoskins, who is an inmate at Western Correctional Institution, is suing Defendants for allegedly providing him inadequate medical care. He also claims that Warden Richard Graham, Jr. failed him with respect to the administrative remedy procedure (ARP) requests he filed about his medical treatment.

Wexford Health Sources, Inc., and Beverly McLaughlin, LPN (collectively, the Medical Defendants) filed a motion to dismiss or for summary judgment (ECF No. 15). Mr. Hoskins filed an opposition and the Medical Defendants filed a reply. ECF Nos. 18, 22. Warden Graham filed a separate motion to dismiss or for summary judgment. ECF No. 26. Mr. Hoskins filed an opposition on August 16, 2018. ECF No. 28. Graham filed a reply on August 29, 2018. ECF No. 29. Mr. Hoskins filed supplements on January 2 and January 7, 2019, and the court granted the Medical Defendants' motion for an extension of time to file a response. ECF Nos. 31, 32, 34. The Medical Defendants filed the response on March 8, 2019. Pursuant to Local Rule 105.6 (D. Md. 2018), a hearing is not necessary at this time.

## BACKGROUND

Mr. Hoskins initiated this action on December 27, 2017.[1] He alleges that he is receiving inadequate medical care, that his rights under the Americans with Disabilities Act (ADA) have been violated, and that Warden Graham has improperly handled his Administrative Remedy Procedure requests.

Mr. Hoskins states that he has a degenerative disease, bulging and herniated discs with bone spurs, sciatica, and has suffered two strokes, which cause him headaches, cramps, spasticity, and ear ringing. He is confined to a wheelchair. ECF No. 1, pp. 1-2. He alleges that his pain medications, Baclofen, Tramadol, and Neurontin, have been inconsistently provided and improperly discontinued. ECF No. 1, 9, 32.

Mr. Hoskins also alleges that: 1) in late 2015, Beverly McLaughlin told him that she was not renewing his orders for fish oil, skin lotion, Tolnaftate (an antifungal), selenium sulfide lotion (for dandruff and scalp infection), and Lovastatin, a cholesterol medication, for cost cutting reasons. ECF No. 9, pp. 2 & 3-4; 2. Ms. McLaughlin "ignored" his stroke symptoms of facial sagging on the right side, blurred/double vision, severe weakness that was worse on the right side, cramps, and a severe headache; 3) he received improper treatment for MRSA; (methicillin-resistant staphylococcus aureus)[2] 4) he was not provided blood thinners or additional pain medication on the days he suffered the strokes; 5) Ms. McLaughlin advised she was ordering him a leg and ankle brace but did not because she was "worried about the cost"; and 6) "for all (3) of

---

[1] The procedural history of this case is detailed in the court's May 30, 2019, Memorandum Opinion (ECF No. 19).

[2] Methicillin-resistant staphylococcus aureus (MRSA) causes a staph infection that is resistant to several common antibiotics. Treatments may include draining the infection and antibiotics. *See* https://medlineplus.gov/mrsa.html (last visited March 11, 2019.)

[his] ARPs [administrative remedy procedure requests] the Warden's Office failed me miserably."
ECF No. 9, pp. 2 & 6. He claims that Ms. McLaughlin has shown "a pattern in his personal care"
by refusing to reorder his cholesterol medication, failing to recognize his stroke symptoms, and
failing to order him leg and ankle braces because she is worried about the cost, and says she may
have been following orders, but he is not sure. ECF No. 9 p. 8. As relief, Mr. Hoskins asks for
copies of his medical records, medical braces, a "proper" pair of boots; and monetary damages.
ECF No. 9, pp. 6-8.

Mr. Hoskins maintains that he had always been treated for hypertension and had been given
cholesterol medication until Ms. McLaughlin cancelled it. He states that he suffered a stroke on
January 9, 2017, and another stroke on January 10, 2017. He alleges that when he went to the
infirmary, Ms. McLaughlin ignored that the right side of his face was sagging, his vision was
blurred, he was seeing double, he was severely weak with his right side worse, he had cramps, and
a severe headache. Instead she diagnosed him as "hypertensive." He faults Ms. McLaughlin for
"failing to recognize his stroke symptoms" on January 9, 2017, and again on January 10, 2017.
ECF No. 9, pp. 2-3, 9. He complains too that he was not seen by a physician on January 9, 2017.
Mr. Hoskins states that when he had his second stroke on January 10, 2017, Ms. McLaughlin told
him he was "faking." *Id.*, p. 3. It was not until medical staff member Ryan Browning came by,
that a physician was called and then none was available to attend Mr. Hoskins. *Id.* Forty-five
minutes later a doctor examined him and ordered an ambulance to take him from the prison to the
hospital.[3] He contends that on both days when he had strokes he was not provided blood thinners
or additional pain medication. *Id.* He alleges that his strokes, the permanent loss of strength on

---

[3] Mr. Hoskins was hospitalized at Western Maryland Regional Center. He was admitted to
the Maryland Transition Center (MTC) infirmary on or about January 17, 2017. ECF No. 26-3 at
26; ECF No. 9 p. 4.

his right side, constant severe headaches, cramps and spasms of the right arm and leg, and double vision are due to inaction by Ms. McLaughlin and other medical staff. *Id.*, p. 4.[4]

Mr. Hoskins claims that he was seen for a "MERSA" infection on September 15, 2016, and again in October and November of 2016, and was prescribed Tolnaftate[5] and Gold Bond Powder. When he was transferred to another prison, the Maryland Transition Center (MTC), for physical therapy, a physician noted an "outbreak" on his left ear. The area was swabbed and tested with the results returning positive for MRSA (methicillin-resistant staphylococcus aureus). Mr. Hoskins claims that he was never properly treated for MRSA and he still has outbreaks. ECF No. 9, pp. 2 & 6; ECF No. 32 p. 6.

Mr. Hoskins also complains about the WCI Administrative Remedy Procedure ("ARP") grievance process. He filed an ARP about the delay in providing him a wheelchair and physical therapy (WCI-0761-17). On October 1, 2016, he filed an ARP (WCI-2202-16) to complain about the inadequate medical treatment he had received for his boils and a rash on his skin. On December 11, 2017, he filed ARP WCI-3108-17 to complain that he was not receiving his pain medications Baclofen and Tramadol. ECF No. 9, p. 10; ECF No. 26-3. He asserts that "for all (3) of my ARPs the Warden's Office failed me miserably." ECF No. 9, pp. 4-6.

Mr. Hoskins filed supplements to his complaint on January 2 and January 7, 2019. ECF Nos. 31, 32. He alleges that from December 12 to 18, 2018, he was not given his prescribed medications, Lisinopril (blood pressure), Lipitor (cholesterol), and Lasix (diuretic or "water pill")

---

[4] Mr. Hoskins mentions other medical staff in his filings but does not name them as defendants.

[5] Tolnaftate stops the growth of fungi that cause skin infections, including athlete's foot, jock itch, and ringworm. https://medlineplus.gov/druginfo/meds/a682617.html (last visited on March 11, 2019).

and was just given his Tylenol after receiving none since the first week of November 2018. He states he ran out of Tramadol for 10 days and was told he may never get more even though his prescription did not expire until January 15, 2018 [2019?]. ECF No. 31, p.1. Mr. Hoskins states a Ms. Bumni, whom he understands is employed by the state of Maryland, is "weaning" all inmates off the pain medications Tramadol and Neurontin, and he notes that as of January 1, 2019, Corizon, Inc. will replace Wexford as the contractual provider of medical services. Mr. Hoskins maintains that his conditions are worsening, and he is receiving less medication for worsening back pain, spasms, and cramps. He states "[t]hey say my meds cost to[o] much, I then had 2 strokes w/out them." ECF No. 31 p. 2; ECF No. 32 p. 3.

Mr. Hoskins is suing Defendants in their official capacities for acting with deliberate indifference and under the Americans with Disabilities Act and the Rehabilitation Act for discriminating against him by refusing to accommodate his physical disabilities by: 1) failing to give him his medications, including his medications for cholesterol, blood pressure, and pain, for long periods of time potentially causing his two strokes, cramps, spasms, headaches, pain in his lower back, right shoulder, right arm, leg, and foot; 2) restricting his medications due to cost, potentially causing his January 2017 strokes; 3) failing to provide him a wheelchair for months; 4) failing to provide physical therapy for months; and 5) failing to properly treat his MRSA. *Id.* at 5-6. He asks the court to appoint him counsel. *Id.* at 6-7; *see also* ECF No. 35 p.2.[6] Mr. Hoskins claims that Defendants have failed to comply with their medical contract with the State of Maryland to provide equal protection, proper medical care, to honor the ARP process and notify the Commissioner. ECF No. 31 p. 6.

---

[6] On January 28, 2019, Mr. Hoskins filed an additional supplement. ECF No. 35.

Mr. Hoskins says he knows that there is a "real world" epidemic of people overdosing, but he is not aware of any government order to stop providing Baclofen, Neurontin, or Tramadol. ECF No. 32 p. 1. Mr. Hoskins states that he has never been accused or issued an infraction for abusing, hoarding, or selling his medications. *Id.* He requests additional injunctive relief, including: examination by a physician; reordering his medications; re-evaluating his pain, cramps and spasms; consideration for back surgery; transfer to another prison or his release; for the medical provider to hold chronic care clinics every 90 days instead of 120 days to parallel the length of time a narcotic such as Neurontin or Tramadol cane be prescribed at one time; and to order "Dr. Bumni from regional headquarters to cease dismissing the overall use of Tramadol, Neurontin, placing inmates on antidepressants instead." *Id.* at 7-8.

## I.      Medical Defendants' Response

The Medical Defendants' response is filed with verified copies of Mr. Hoskins' medical records, Beverly McLaughlin's affidavit, and the affidavit of Asresahegn Getachew, M.D. ECF No. 15.[7]

Mr. Hoskins' medical record shows that on January 9, 2017, at 9:19 am. Ms. McLaughlin, a physician's assistant and nurse practitioner, saw him for complaints of loss of balance, feeling like he was going to fall when he tried to stand, numbness on the right side of his face, "post" neck pain with tingling around the mouth extending behind his ear up to his eye, and right arm limpness. His blood pressure was elevated. Mr. Hoskins reported subjective complaints of his entire right side feeling odd and tingling. He denied chest pain and his EKG was within normal limits. ECF No. 15-6, Medical Record.

---

[7]      Medical Defendants' Exhibits 1 and 6 exist only in a paper format. ECF No. 15-3, ECF No. 15-8. They cannot be accessed electronically.

On January 9, 2017, Ms. McLaughlin discussed Mr. Hoskins' case with Dr. Barrera, and Mr. Hoskins was admitted to the WCI infirmary for observation. Mr. Hoskins was administered a one-time dose of clonidine.[8] ECF No. 15-6, Ms. McLaughlin Aff. ¶8. Defendants assert that after he was admitted to the clinic, medical providers frequently assessed Mr. Hoskins for signs and symptoms of a stroke. ECF No. 15-3, Ex. 1 (separately filed in paper format). Mr. Hoskins was assessed by James Wilt, R.N. at 1:21 p.m. on January 9, 2017, his blood pressure was checked and it was recorded that Mr. Hoskins had "altered cardiac function." The medical records indicated "neurochecks" and blood pressure checks were to be done every four hours. The next record for January 9, 2017, was written by Keri Davis RN at 6:57 p.m. It reports that Mr. Hoskins stated, "I had a stroke this morning." Further, Mr. Hoskins complained of his right side feeling different and the right side of his face felt tingly. His "neuros" were within normal limits. ECF No. 15-3, Ex. 1 (separately filed in paper format. On January 10, 2017, at 4:09 a.m., Rachel Murphy, R.N. noted that Mr. Hoskins' blood pressure was elevated, there was no facial drooping, he had received Norvasc[9] per physician's order, and that he had reported having a tingling feeling to his right side earlier. Dr. Getachew states the assessments were "reassuring" and monitoring continued. ECF No. 15-7; ECF No. 15-1, Affidavit of Asresahegn Getachew, M.D., ¶¶ 3-4.

On the following morning, January 10, 2017, Mr. Hoskins' blood pressure was evaluated, his right side was notably weaker than the left, and he had visual changes and slurred speech. Defendants assert that "[p]rior to the change in status, the medical providers had insufficient evidence to conclude that Mr. Hoskins was a "significant risk for a stroke." *Id.* ¶6. Once the risk

---

[8]    Clonidine    is    used    to    treat    high    blood    pressure.    *See* https://medlineplus.gov/druginfo/meds/a682243.html (last visited March 11, 2019).

[9]    Norvasc (generic name amlodipine) is used to treat high blood pressure and chest pain. *See* https://medlineplus.gov/druginfo/meds/a692044.html (last visited March 11, 2019).

of potential stroke was revealed on the morning of January 10, 2017, a physician saw Mr. Hoskins, arranged to transfer him by ambulance to a hospital, and the ambulance left the prison within the hour. *Id.* ¶5. The medical record on January 10, 2017, completed by James Wilt, RN, indicates that "during morning rounds, Mr. Hoskins complained of right sided weakness and numbness, his blood pressure was elevated, and the right side was notably weaker than the left. ECF No. 15-3 Ex. 1 (filed in paper format). He complained of vision changes to his right eye and his speech was slurred." The record shows that at 8:00 a.m. Dr. Ashraf evaluated Mr. Hoskins. Dr. Atnafu was contacted to approve sending Mr. Hoskins to the hospital by ambulance. The ambulance left the prison at 8:54 a.m. ECF No. 15-3, Ex. 1 (filed in paper format).

Ms. McLaughlin denies ignoring Mr. Hoskins' complaints on January 9, 2017. She states that once Mr. Hoskins was admitted, she did not "formally assess him nor was [she] responsible for his monitoring and assessment as this was done by other medical providers." ECF No. 15-4, McLaughlin Aff. ¶8. She also denies accusing Mr. Hoskins of "faking" his symptoms. *Id.*

Regarding her decision to discontinue Mr. Hoskins' fish oil capsules, skin lotion, tolnaftate and selenium sulfide lotion, Ms. McLaughlin states that when she saw him on June 12, 2016, he did not complain of dry skin or other issues requiring skin lotion or selenium sulfide. Additionally, because he was receiving Lisinopril for hypertension, fish oil was not medically necessary. Therefore, she discontinued the medical orders for Lubriderm Daily Moisture, selenium sulfide, and fish oil. ECF No. 25-4 McLaughlin Aff. ¶4.

She states that during in 2015, 2016, and 2017, Mr. Hoskins had active orders for the hypertension medication Lisinopril and later, Zestril. *Id.* ¶5. She asserts that contrary to Mr. Hoskins' allegations, he did not have an ongoing diagnosis of high cholesterol nor were any cholesterol medications discontinued as alleged in the complaint. *Id.,* ¶6. She states that

cholesterol medications generally are not prescribed for hypertension, and even if such medications were discontinued, it would not have impacted Mr. Hoskins' treatment for hypertension. *Id.,* ¶8.

Mr. Hoskins was discharged back to WCI's infirmary on March 9, 2017.[10] Dr. Getashew states that Mr. Hoskins had access to infirmary wheelchairs. The following day, March 10, 2017, he returned to his housing unit with an order for a wheelchair. WCI housing units have wheelchairs available to those inmates with a wheelchair order. On March 23, 2017, Mr. Hoskins asked for a personal wheelchair which he received on May 4, 2017. ECF No. 15-7, Getachew Aff. ¶ 7-9; ECF No. 15-10.

Before he returned to WCI on March 9, 2017, Mr. Hoskins was provided physical therapy five days per week from January 17, 2017, to March 3, 2017, and then switched to three days of therapy per week. ECF No. 15-7, Getachew Aff. ¶10. After he returned to WCI he resumed physical therapy on May 25, 2017, until it was stopped on September 14, 2017. At that point, it was determined he had reached "optimum level of functional mobility and obtained optimum benefit from physical therapy" and was discharged to self-management. *Id.* ¶ 11-12; *see also* ECF No. 15-12, p. 30. Dr. Getachew opines that because Mr. Hoskins received "substantial therapy" before he returned to WCI, his recovery "was not impacted by beginning physical therapy in May of 2017 as is demonstrated by the physical therapy records documenting Plaintiff as having obtained optimal functional mobility and benefit from physical therapy." ECF No. 15-7, Getachew Aff. ¶10. Mr. Hoskins' medical chart notes that on September 14, 2017, he continued to have

---

[10] After his discharge from the Western Maryland Regional Medical Center, Mr. Hoskins was immediately transferred to the Maryland Transition Center (MTC).

weakness and partial paralysis (hemiplegia and hemiparesis) and was unable to walk. ECF No. 15-12, p. 30.

Mr. Hoskins had an order for Tolnaftate in early 2016 that expired on February 6, 2016. Defendants indicate that the records for that time do not indicate any fungal infection or other medical issue indicating use of Tolnaftate. Moreover, skin lotion, antifungal cream, and dandruff shampoo are items available in the prison commissary. ECF No. 15-5. The Medical Defendants, however do not provide documentation about the treatment Mr. Hoskins received for MRSA after he returned to WCI from MTC.

## II.     Warden Graham's Response

Mr. Hoskins asserts that Warden Graham "belittled' the ARP process and failed him miserably "for all (3) of his medically related ARPs." ECF No. 9, pp. 4-6, 8. He claims that the Warden has "done nothing to protect[] my rights." *Id*. p. 8. He provides no further explanation of this claim.

Mr. Hoskins' prison records show that on October 16, 2016, he filed ARP 2202-16, complaining that he saw a nurse on September 14, 2016, for boils and a rash on his hands and legs. Mr. Hoskins was told he needed to see a doctor soon. On September 27, 2016, when he asked a corrections officer if he could be seen as an emergency, a medical staff member said not to call. ECF No. 26-3.

The ARP complaint was sent to the medical department for investigation. Mr. Hoskins' medical records were consulted. ECF No. 26-3 pp. 4-10. On October 29, 2016, the Warden or his designee dismissed the ARP. The response stated that on September 15, 2016, a nurse evaluated Mr. Hoskins for a red, dry, patchy, and itchy rash on his groin area with a marble size mass to the left side of the groin. No drainage or pustules were noted. Mr. Hoskins was referred

to a nurse practitioner. On October 10, 2016, a nurse practitioner evaluated him for complaints of a mass in the groin area. "It is noted that the mass is now gone and you reported that was not painful, soft, and did not move." Mr. Hoskins was instructed to keep a record, and if the problem reoccurred to contact the medical department. ECF No. 26-3 p. 2. Mr. Hoskins appealed the decision to the Commissioner of the DPSCS. He said that when he was examined for the mass, he in fact had four masses, two with pus and they were all very painful and left scars, and the rash had since spread to his hands. The Commissioner dismissed the appeal for failure to provide evidence to substantiate the claim. ECF No. 26-3, pp. 14-16.

In ARP WCI-0761-17, dated April 4, 2017,[11] Mr. Hoskins complained about his access to a personal wheelchair and physical therapy. He complained that his wheelchair was ordered on March 10, 2017, but that he still had not received the chair. Mr. Hoskins stated that he was unable to go to sick call "again" because he did not have a wheelchair. He also complained he was receiving no physical therapy. ECF No. 26-3, p. 21, 23. On June 9, 2017, the Warden or his designee found the ARP meritorious in part. *Id.*, p. 22. The Warden's response noted that while in the hospital and at the MTC infirmary, Mr. Hoskins received physical therapy regularly and showed marked improvements. Mr. Hoskins was supposed to continue therapy 2 to 3 times each week at WCI. Since he returned to WCI, he had not been evaluated for, nor received any physical therapy. It was also noted that on March 23, 2017, a wheelchair was ordered. Mr. Hoskins was also given paperwork for a wheelchair with a pusher to be assigned to him for long distances to use until his personal wheelchair arrived. Mr. Hoskins was provided his wheelchair on May 4,

---

[11] Mr. Hoskins filed an ARP request on April 3, 2017, and another on April 4, 2017, both concerning his need for a wheelchair. The two ARP filings were assigned the same case number ARP WCI-761-17. ECF No. 26-3, pp. 21, 30.

2017.  ECF No. 26-3, pp. 21, 22.  His appeal to the Commissioner was dismissed because the issues had been fully addressed.  ECF No. 26-3, p. 36.

On December 11, 2017, Mr. Hoskins filed ARP WCI-3108-17 to complain that he was not receiving his pain medications, Baclofen and Tramadol, since December 2, 2017.  He said that he had to be taken to the medical department for excessive pain in his right leg, right arm, right ear, and head.  Mr. Hoskins said he had a new prescription that started on November 27, 2017, but the pharmacy would not refill his medication because there was a limit on the number of times the medication could be refilled.  He also complained that his Tramadol prescription was cancelled.  He argued that he was not being tapered off the medication or evaluated by a doctor before the medication was stopped.  He complained that he had learned that he was being taken off Baclofen because it "conflicts" with Tramadol.  ECF No.  26-3, p. 45-62.

After investigation, on January 31, 2018, the Warden or his designee dismissed the ARP as follows:

> Your request for administrative remedy has been dismissed.  You were seen on 11-29-17 by the provider for cardiovascular.  Baclofen was discontinued at that time since it is not a medication that should be used chronically and there is no current muscle spasm and it interacts with your Ultram.  The provider submitted a non-formulary for Tramadol[12] and Gabapentin[13] on 11-29-17 and it was approved for the Tramadol and the Gabapentin was approved to be tapered at 600 mg twice daily x 1 week, then 500 mg twice daily x 1 week, then 400 mg twice daily x I week, then l00 mg twice daily x 1 week, then 100 mg once a day then discontinued.  You will continue to be monitored through the sick call process.

ECF No.  26-3, p. 46.

---

[12]  Ultram is a brand name for the generic drug Tramadol used to relieve pain.  *See* https://medlineplus.gov/druginfo/meds/a695011.html (last visited March 11, 2019).

[13]  Gabapentin is the generic name Neurontin, an anticonvulsant that changes the way the body senses pain.  *See* https://medlineplus.gov/druginfo/meds/a694007.html (last visited March 11, 2019).

Warden Graham has filed a declaration in which he states that he does not have any personal involvement in providing medical care to any WCI inmate, authority to make decisions concerning any inmate's medical care, or the authority to order the contractors' medical staff to prescribe medication, perform a particular procedure, or to provide a particular treatment. Medical services are provided to WCI inmates by a private medical contractor. Warden Graham states that he is not a licensed medical provider. He has no responsibility under the medical company's contract to monitor the provision of medical services to WCI inmates. He states that when he responds to WCI inmate complaints about the medical care they receive, he relies on the assessments and judgments of the medical contractor's trained medical staff to prepare a response. He states that he has not interfered with, hindered, or delayed medical treatment or care to Mr. Hoskins, nor does he have information to believe any DPSCS employee has done so. ECF No. 26-2, Affidavit of Richard Graham, Jr. ¶¶ 2, 4, 6.

### STANDARD OF REVIEW

"'[T]he purpose of Rule 12(b)(6) is to test the legal sufficiency of a complaint'" and not to "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)(*quoting Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999)). As the legal sufficiency of the complaint is challenged under a Rule 12(b)(6) motion, the court assumes "the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *Eastern Shore Mkts. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000)(citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). A Rule 12(b)(6) motion to dismiss "should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true, it appears certain that plaintiff cannot prove any set of facts in support of his

claim entitling him to relief." *Migdal v Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 325 (4th Circ.2001); *see also Venkatraman v. REI Sys, Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). Furthermore, the "Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Rather, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal*, 248 F.3d at 325-26; *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

In reviewing a complaint, the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman*, 417 F.3d at 420; *Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir. 1997); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, in considering a motion to dismiss, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments" nor "the legal conclusions drawn from the facts." *Eastern Shore Mkts., Inc.*, 213 F.3d at 180; *see also Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 329 F.Supp.2d 574, 578 (D. Md. 2004).

Because Mr. Hoskins is self-represented, the court must liberally construe his submissions. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

The court is mindful that a self-represented litigant is generally "held to a 'less stringent standard []' than is a lawyer, and the court must liberally construe his claims, no matter how 'inartfully' pled." *Morrison v. United States*, RDB-12-3607, 2014 WL 979201, at *2 (D. Md. March 12, 2014) (internal citations omitted); *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007);

15

*Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *Bala v. Cmm'w of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013) (per curiam) (same).

## DISCUSSION

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003), citing *Wilson v. Setter*, 501 U.S. 294, 297 (1991). To state an Eighth Amendment, claim for denial of medical care, a plaintiff must demonstrate that Defendants' acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed either to provide it or ensure the needed care was available. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

A "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko,* 535 F.3d at 241 (internal quotation marks and ellipses omitted). Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer,* 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336,

340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter ... becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), (quoting *Farmer*, 511 U.S. at 844).

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *Brown v. Harris,* 240 F. 3d 383, 390 (4th Cir. 2000); *see also Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014). An inmate does not have a constitutional right treatment of choice, *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Moreover, an inmate's disagreements with medical staff over the necessity for or extent of medical treatment do not rise to a constitutional injury. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985); *see also Fleming v. LeFevere*, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

Further, "any negligence or malpractice on the part of ... doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones,* 145 F.3d 164, 166 (4th Cir. 1998). To show deliberate indifference, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted) (overruled in part on other grounds by Farmer, 511 U.S. at 837; aff'd in pertinent part by *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732 (Mem) (4th Cir. 2015)). Adequacy of treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).

## I.  Medical Defendants

The Medical Defendants argue that they are entitled to the dismissal of the claims against them or summary judgment in their favor on the grounds of respondeat superior and because the evidence shows that they did not act with the requisite deliberate indifference.  They also raise qualified immunity as an affirmative defense.

### A.  Medical Care regarding fish oil and lotions

Mr. Hoskins contends that Ms. McLaughlin improperly discontinued orders for fish oil capsules, skin lotion, and selenium sulfide lotion.  He does not dispute that when he met with Ms. McLaughlin on June 12, 2016, he had no complaints of dry skin or other issues requiring skin lotion or selenium sulfide.  Further, he provides no evidence to refute that because he was receiving Lísinopril for hypertension, fish oil was not medically necessary.  Even when the facts are viewed in the light most favorable to him, Mr. Hoskins does not show Ms. McLaughlin acted with deliberate indifference to his serious medical needs when she stopped his medical orders for Lubriderm Daily Moisture, selenium sulfide and fish oil.  In the absence of a genuine dispute as to any material fact, Ms. McLaughlin is entitled to summary judgment as to this claim.

### B.  Respondeat Superior

Wexford, a private contractor that provides health care at correctional facilities, argues that dismissal of the claims against it is warranted because the doctrine of respondeat superior does not apply to § 1983 claims.  *See Love-Lane v. Martin,* 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).  Generally, § 1983 liability is not available solely upon a theory of respondeat superior.  Wexford also seems to suggest that its status as a "corporate entity providing services through their employees or agents" alone insulates it from liability as to Mr. Hoskins' constitutional claims.  Wexford cannot be held liable under a theory of respondeat

superior, but a private corporation is liable under § 1983 "when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Austin v. Paramount Parks,* 195 F.3d 715, 727-28 (4th Cir. 1999). Known as *Monell* liability, Wexford can be held responsible as a corporate entity if "certain affirmative decisions of [Wexford's] individual policymaking officials, or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999); *See also Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978); *Alvarez v. Maryland Department of Corrections*, Civil Action No. PX-17-141, 2018 WL 1211533 *10 (D. Md.) (March 8, 2017). Wexford's custom or practice may provide an alternate route to *Monell* liability "even though such a custom has not received formal approval through the body's official decision making channels," *Monell*, 436 U.S. at 690. *See also Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Md. Dep't of Pub. Safety & Corr. Servs.*, 316 Fed.Appx. 279, 282 (4th Cir. 2009). *Alvarez v. Maryland Department of Corrections*, Civil Action No. PX-17-141, 2018 WL 1211533 *10 (D. Md.) (March 8, 2017). Viewing Mr. Hoskins' allegations in the light most favorable to him, the court will deny summary judgment as to the claims against Wexford.

At this stage, the court is obligated to construe liberally Mr. Hoskins' self-represented complaint so that potentially meritorious claims proceed. Mr. Hoskins seems to allege that Wexford contracted with the Maryland Department of Corrections to provide medical treatment to inmates; that Wexford has demonstrated deliberate indifference to his serious medical needs; and importantly, that Wexford has implemented its unconstitutional policy through its decisions of those in supervisory power who provided direct care to him, which may include Ms. McLaughlin and others he identifies in the text of his filings. As will be discussed later, counsel

will be appointed to represent Mr. Hoskins, and counsel will have an opportunity to clarify the claims.

Questions remain about the care and monitoring Mr. Hoskins received from Ms. McLaughlin and other medical staff members on the first day of his stroke, Ms. McLaughlin's alleged failure to act on the second day Mr. Hoskins suffered a stroke, the reasons for the delay in resuming physical therapy when he returned to WCI, and what care, if any, Mr. Hoskins has received since his return to WCI for MRSA. Ms. McLaughlin asserts that she did not formally assess Mr. Hoskins nor was she responsible for his monitoring and assessment, and so it is unclear what role she played after admitting him to the WCI infirmary on January 9, 2017, and through the next day when he was sent to the hospital. Further, Mr. Hoskins' allegations about inconsistent administration of his prescribed medications, given his history of hypertension, failing to provide adequate supplies of prescribed medications, and discontinuing medications, raise genuine issues of material fact inappropriate for summary judgment. [14]

### C.     Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A defendant is not entitled to summary judgment based on qualified immunity if (1) a genuine issue of material fact exists regarding whether the government official violated one of the plaintiff's federally protected rights,

---

[14]     The Medical Defendants argue that Hoskins' medical malpractice claims may be barred by the Maryland Health Malpractice Claims Act. Because counsel will be appointed in this case, the court will defer consideration of this argument.

and (2) the right at issue was "clearly established" at the time of the events in question. *See id.* at 232. Ms. McLaughlin is not a government official. Instead, she provides medical services to inmates through a contract between Wexford, her employer, and the Department of Public Safety and Correctional Services. She relies on *Filarsky v. Delia*, 566 U.S. 377 (2012), by way of analogy to support her affirmative defense. In *Filarsky*, the Supreme Court held that private individuals may assert qualified immunity when they are "retained by the [government] to assist [in a task for which] government employees performing such work are entitled to seek the protection of qualified immunity." 566 U.S. at 393-94. Defendants cite no Fourth Circuit decisions extending *Filarsky* to their situation and there is a split of authority in other circuits:

> Circuits are divided on whether privately employed doctors who provide services at prisons or public hospitals pursuant to state contracts are entitled to assert qualified immunity. *Compare McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012) (no immunity for privately paid physician working at county prison), *Jensen v. Lane Cty.*, 222 F.3d 570 (9th Cir. 2000) (no immunity for privately employed psychiatrist providing services at public psychiatric hospital), *and Hinson v. Edmond*, 192 F.3d 1342 (11th Cir. 1999) (no immunity for privately employed physician providing services at county jail), *with Estate of Lockett ex rel. Lockett v. Fallin,* 841 F.3d 1098 (10th Cir. 2016) (immunity for privately employed physician providing services at state penitentiary). After considering the facts of this case in light of the history and purposes of immunity, we find the cases disallowing immunity distinguishable and hold that Drs. Thompson and Nicholl may assert the defense of qualified immunity.

*Perniciaro v. Lee*, 901 F.3d 241, 251 (5th Cir. 2018)(footnote omitted). *See also, Currie v. Chhabra*, 728 f.3d 626, 632 (7th Cir. 2013). In any event, qualified immunity would be inappropriate at present in this case. The right at issue, "to adequate medical care and freedom from deliberate indifference to medical needs has been clearly established by the Supreme Court and this Circuit since at least 1976." *Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016). The facts of this case, as discussed above, need further exploration before it can be determined whether that right has been violated.

## II.     Warden Graham

Warden Graham raises Eleventh Amendment immunity as an affirmative defense from suit in federal court for claims asserted in his official capacity.  The Eleventh Amendment to the United States Constitution bars a suit in federal court against a State, one of it agencies or departments, or one of its officials acting in an official capacity, without a valid abrogation or waiver of the State's sovereign immunity.  *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989); *Pennhurst State School & Hospital v. Haldeman*, 465 U.S. 89, 100 (1984); *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001).

Because the State of Maryland has not waived its sovereign immunity, a suit brought in federal court for money damages against Warden Graham, who is a state employee, in official capacity, is an action against the State of Maryland and is barred by the Eleventh Amendment.  Accordingly, all monetary claims against Warden Graham in his official capacity will be dismissed.  To the extent that Mr. Hoskins' claims that Warden Graham failed him during the ARP process, the evidence shows that Mr. Hoskins' claims were promptly investigated and he was provided responses, two of which found merit to his ARP claims.  Mr. Hoskins' allegations do not state a claim of constitutional violation, and summary judgment is granted as to this claim.

Warden Graham failed to respond to Mr. Hoskins' claims under the ADA and his equal protection claim.  As such, the court will deny summary judgment in regard to these claims.

## CONCLUSION

For these reasons, the court will, in a separate order, grant in part and deny in part the Medical Defendants' and Warden Graham's motions to dismiss or for summary judgment.  (ECF Nos. 15, 26).  Summary judgment will be entered in favor of the Medical Defendants as to the claim that Ms. McLaughlin stopped Mr. Hoskins' medical orders for fish oil capsules, skin lotion,

and selenium sulfide lotion.  ECF No. 15.  Summary judgment will be denied as to all other claims against the Medical Defendants.  *Id*.  Warden Graham's motion to dismiss or for summary judgment (ECF No. 26) is granted as to Mr. Hoskins' ARP claims, and denied as to Mr. Hoskins' claims under the ADA.  The court will grant Mr. Hoskins' request to appoint counsel.  ECF No. 31 pp. 6-7; *see also* ECF No. 35 p. 2.

March 13, 2019                                                    /s/
                                          DEBORAH K. CHASANOW
                                          United States District Judge